**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 22 2014, 8:50 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**RUTH JOHNSON**
**AMY E. KOROZOS**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINE M. REDELMAN**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of K.T., Minor Child, and K.S., Mother, | ) ) ) ) |
| K.S., | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) No. 49A05-1312-JT-580 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge
The Honorable Larry Bradley, Magistrate
Cause No. 49D09-1304-JT-14084

**July 22, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

K.S. ("Mother") appeals the involuntary termination of her parental rights to K.T., raising the following restated issues:

I.      Whether the Indiana Department of Child Services ("DCS") presented clear and convincing evidence to support the juvenile court's termination of Mother's parental rights; and

II.     Whether the juvenile court abused its discretion in denying Mother's motion to continue the termination hearing.

We affirm.

## FACTS AND PROCEDURAL HISTORY

K.T. was born to Mother and L.T. on November 7, 2011.[1]  On December 15, 2011, DCS filed a petition alleging that K.T. was a Child in Need of Services ("CHINS")[2] because Mother and L.T. had "failed to provide [K.T.] with a safe and appropriate living environment free of domestic violence."  *Pet'r's Ex.* 1 at 2.  At the time of the CHINS filing, Mother was twenty years old and a single mother of two children.  Mother had been diagnosed several years earlier with multiple personality disorder, depression, anxiety, and post-traumatic stress disorder ("PTSD").

During the January 23, 2012, pre-trial hearing, Mother, represented by counsel, admitted the allegations in the CHINS petition, including that she and L.T. had a history of domestic violence, were involved in an altercation in front of K.T. that resulted in L.T.

---

[1] L.T. "consistently disputed paternity" of K.T., *Appellant's App.* at 37, and Mother testified during the termination hearing that L.T. is not K.T.'s biological father.  *Tr.* at 40.  L.T., however, filed a paternity affidavit establishing his paternity when K.T. was born.  *Id.* at 39.  Accordingly, L.T.'s parental rights to K.T. were also involuntarily terminated.  L.T. does not appeal that termination.

[2] The petition also alleged that K.T.'s half-sister, R.W., was a CHINS.  R.W. was later placed with her father and was not part of the termination proceeding; therefore, we include only facts relating to the termination of Mother's parental rights to K.T.

being arrested, failed to address their domestic violence issues, and failed to provide K.T. with a safe environment free from domestic violence. Based on Mother's admissions, the juvenile court found K.T. was a CHINS. DCS requested a no-contact order between Mother and L.T. and between L.T. and K.T. The guardian ad litem ("GAL") stated a concern about K.T. remaining in Mother's care. The juvenile court advised Mother that K.T. would be removed from her home if there was any contact between Mother and L.T.

The juvenile court also ordered Mother to submit to weekly, random drug screens. At that point in the proceedings, Mother "became loud and belligerent. She pushed back the chair and began to swipe things off. Began cursing at the judge. Called the judge several names and the bailiff came in . . . ." *Tr.* at 191. The bailiff attempted to calm down Mother, but Mother walked out of the courtroom before the hearing came to an end. Noting that "[M]other is unwilling to participate in services and is unwilling to participate in drug screens," the juvenile court ordered K.T. removed from Mother's care. *GAL Ex.* I at 77.

Immediately after the hearing, the court appointed special advocate ("CASA") received numerous voicemail messages from Mother. In those messages, Mother cursed, threatened to kill the CASA and "kick [her] ass," threatened to take K.T., and threatened to kill herself and K.T. *Tr.* at 192. Mother later wrote a letter to the juvenile court, apologizing and asking to be referred to services.

In February 2012, the juvenile court held a dispositional hearing, at which K.T.'s placement outside the home was continued. During the hearing, Mother was ordered to abide by a Parental Participation Order, which required her to: participate in a program of home-based counseling and follow all recommendations; complete substance abuse

3

assessment and follow all recommendations; submit to random drug screens; complete a psychological evaluation and a domestic violence evaluation and follow all recommendations; complete anger management; and abide by the no-contact order. Additionally, Mother was ordered to obtain safe and stable housing and maintain a stable legal source of income.

In April 2012, Mother stated that she had "consistently participated in parenting time, [was] participating in services, [had] formally apologized to the Court for previous negative behaviors, . . .[and] indicate[d] an acceptance of anger management concern but note[d] that her behavior [was] largely based on her ongoing needs for medication [for] which she require[d] a prescription." *Pet'r's Ex.* 10 at 30. Accordingly, Mother requested one of the following: that K.T. be placed in her care; that K.T. be placed in relative care with K.T.'s maternal grandmother; or if K.T. was to remain in the care of DCS, that Mother's parenting time "be significantly increased." *Id.* DCS objected to K.T. being placed with Mother or maternal grandmother. The juvenile court ordered K.T. to remain in the care of DCS; however, the court authorized increased parenting time for Mother and continued K.T.'s permanency plan of "reunification with parent(s)." *Id.* at 31.

During a July 2012 hearing, the juvenile court found Mother needed to participate and show progress in services. In connection with that goal, Mother, DCS, and the service provider signed a contract specifying revised expectations for Mother, including agreeing to meet weekly for mental health services. At that time, Mother stated she would consider "signing specific consents for her mother [K.T.'s maternal grandmother] to adopt [K.T.]." *Pet'r's Ex.* 12 at 38.

4

In November 2012, DCS requested the permanency plan be changed from reunification to termination of parental rights and adoption. The juvenile court noted in its order that Mother's home-based program was closed out unsuccessfully; Mother had not completed the recommended substance abuse treatment; during visits with K.T., Mother often needed redirection in light of her inappropriate behavior and two supervisors were needed; Mother was recently incarcerated for a battery charge; and Mother had not been able to make progress due to her anger issues and defiant behavior. *Pet'r's Ex*. 13 at 43. The juvenile court additionally noted that DCS had made referrals for therapy and that Mother had an evaluation but failed to follow through with treatment. Notwithstanding Mother's shortcomings, the juvenile court denied DCS's request that the plan be changed to termination and ordered the goal to remain that K.T. would be reunified with her parents. The juvenile court also authorized relative placement "upon positive recommendations." *Id*. at 44. Over the objections of DCS and the CASA, the juvenile court authorized maternal grandmother to have supervised parenting time.

Mother was incarcerated numerous times during these proceedings. In October 2012, she was convicted of Class A misdemeanor battery and was sentenced to twelve days executed and 353 days suspended to probation. In December 2012, Mother pleaded guilty to disorderly conduct for yelling and screaming while visiting K.T. at Adult and Child, a mental health center in Indianapolis. *Pet'r's Ex*. 19 at 68. In February 2013, a mental health service provider threatened to discharge Mother due to her missed sessions; the provider, however, agreed to give Mother another chance, yet warned that if she missed three more times, Mother's case would be closed. *Pet'r's Ex*. 15 at 54. In March 2013,

5

Mother was arrested for driving without having received a license. At a second CHINS permanency hearing held on April 1, 2013, the juvenile court ordered K.T.'s plan changed from reunification to adoption. On April 17, 2013, DCS filed a petition for involuntary termination of Mother's parent-child relationship with K.T. About a month later, Mother was arrested for criminal recklessness and intimidation. Mother was incarcerated from June 14 through August 2, 2013, for having violated her pre-trial GPS monitoring. *Tr.* at 24. On July 31, 2013, Mother pleaded guilty to criminal recklessness and intimidation. *Pet'r's Ex.* 19 at 69. While Mother served some time in community corrections, Mother was again incarcerated on September 9, 2013. *Tr.* at 25. Mother was released from jail on October 28, 2013. *Id.* at 220. At the time of the termination hearing, Mother still had 182 days of community corrections to complete, and she was on house arrest at her mother's home. *Id.* at 25.

About two weeks prior to the termination hearing, Mother's public defender, Stephen McNutt, filed a motion for a two-week continuance because Mother was incarcerated and her expected release date had been delayed. The motion stated, "Undersigned counsel needs additional time to work with [Mother] to prepare for trial in this case." *Appellant's App.* at 49. DCS and the GAL did not agree to the continuance, and the juvenile court denied the motion. Mother was released from jail on October 28, 2013. *Tr.* at 220.

On October 30, 2013, the juvenile court held an evidentiary hearing to address DCS's termination petition, at which Mother appeared in person and by counsel. Evidence was introduced regarding Mother's substance abuse issues, mental health issues, history of

domestic violence and anger management issues, and failure to participate in or benefit from services. Additionally, evidence was introduced regarding Mother's success in obtaining stable housing. *Id*. at 4. Regarding substance abuse Mother stated that she had used drugs off and on throughout the CHINS case, but had been clean since June 2013. *Id*. at 9. Mother admitted that she used drugs when she was frustrated. *Id*. at 79. Although DCS made two referrals for Mother, she never completed a substance abuse evaluation or a treatment program.

At the termination hearing, the CASA testified that Mother admitted she and L.T. argued often and that usually Mother was the one who initiated the physical fighting. *Id*. at 189. The current CHINS case began after L.T. pulled Mother's hair, and Mother began hitting him. Thereafter, Mother pulled out about fifty of L.T.'s "dreads" and hit him repeatedly. *Id*. at 44. While asserting that she had completed domestic violence treatment prior to the commencement of K.T.'s CHINS determination, Mother admitted at the termination hearing that she has issues with domestic violence. *Id*. at 5, 6, 20, 227.

Regarding mental health issues, Mother testified that, in her 2006 neuro-psych evaluation, she was diagnosed with multiple personality disorder, depression, anxiety, and PTSD. *Id*. at 26-27. At that time, Mother received mental health treatment as part of a juvenile probation sentence. *Id*. at 12. Mother admitted that she had tried to kill herself "several times," by means of "knives, opiates, [and] benzos." *Id*. at 18. She also testified that, in July 2012, after DCS removed her children from her home, she attempted suicide by cutting open both her stomach and her head. *Id*. In a second suicide attempt, which occurred during the CHINS case, Mother took "a whole bunch of Xanax and a whole bunch

7

of Methadone[].” *Id*. at 19.

Mother had been prescribed drugs to manage her anxiety and depression and was given medication as a sleep aid. At one point in the past, Mother had been placed in a mental health court program and was assigned a counselor. During that period, Mother took her medication regularly for several months. However, during the CHINS case, Mother was erratic in taking her medication. *Id*. at 95.

At the CHINS determination, Mother was ordered to comply with a no-contact order with L.T; however, in January 2012, K.T. was removed from Mother's care, in part, because she was in contact with L.T. During the termination hearing, the CASA testified that Mother said she and L.T. "kinda belonged together," "he had always been part of her life and that nothing the Court could do or anybody could say would change that" because they "had a bond." *Id*. at 189. At the termination hearing, Mother admitted that L.T. still contacts her by phone, but stated that she "had not really had any contact" with him. *Id*. at 30.

Regarding her anger management issues, Mother had several incidents where she threatened or behaved inappropriately with service providers, the GAL, and the DCS FCM. Mother stormed out of team meetings, and at a pre-trial hearing, Mother knocked over chairs, pushed items off a desk, and left the hearing before it was over. *Id*. at 17-18. Michael Parks, a visitation supervisor for Adult and Child, testified that after a cancelled child visitation, Mother yelled and screamed, broke a door, and Parks had to call the police because Mother refused to calm down after repeated warnings. *Id*. at 53. Abbie Rust, a home-based therapist for Adult and Child, testified that Mother had told her, repeatedly, to

8

get an ambulance, because Rust was going to need it. Mother also told Rust that "she was going to beat [her] ass." *Id*. at 83. The visitation coordinator of Adult and Child was also threatened by Mother who was angry because of a cancelled visitation, and said she was going to beat up the coordinator. *Id*. at 15. During one visitation, Mother threatened to take K.T.

Mother testified that the juvenile court had ordered her to participate in services relating to mental health treatment, home-based case management, and several other services. *Id*. at 4. When questioned more closely, Mother admitted, "I completed no services at all." *Id*. When asked why not, Mother explained, "At first, it was just too much." *Id*. Mother also said that she previously had stable housing but had moved in with her parents because, emotionally, she could not return to the home where she had lived with her children. *Id*. at 5. Mother also said that she did not complete ordered domestic violence treatment because she had completed a course in 2011, in connection with a prior CHINS proceeding for her older daughter. Finally, when questioned about mental health treatment, Mother offered that she did not believe she needed mental health treatment because she had been parenting her children without being engaged in mental health treatment prior to DCS's involvement. Mother also testified that her mental health issues "did not come into play" until her children were removed; accordingly, she asked why mental health should "be such a main factor [when] it wasn't a factor before the DCS case took place." *Id*. Later in the hearing, however, Mother admitted that she was more focused and more stable when she took her medication. *Id*. at 26.

On November 4, 2013, Mother's parental rights were terminated. The juvenile court

9

found in relevant part:

11. Although referrals were made for substance abuse, [Mother] failed to follow up on the referrals. [Mother] has a history of substance abuse, with use into 2013. Her drugs of choice being marijuana, benzodiazepine, and opiates.

12. [Mother] completed a domestic violence program in a previous CHINS action in 2011. Since then and during the open CHINS case, [Mother] has exhibited anger and violent behavior, admitted the domestic altercation with [L.T.], and has convictions for Battery, Intimidation and Disorderly Conduct.

13. [Mother] failed to follow up on the two domestic violence referrals made in the current CHINS case.

14. Although being diagnosed with Personality Disorder and [PTSD], and being prescribed medication for Anxiety and Depression, [Mother] testified she did not feel she needed mental health treatment, but at another point said she did. She failed at three psychological evaluation referrals.

15. [Mother] has a history of suicide attempts, using a knife or overdosing on pills.

16. [Mother] attended an engagement group at Midtown on August 29, 2013. The groups were weekly and needed for her probation. She did not attend another prior to being incarcerated on September 9, 2013, eleven days later.

17. [Mother] participated minimally in home based services.

18. Visitation with [K.T.] often did not go well with observation of lack of supervision, not being consistent with redirection, and hostile behavior toward visitation staff and child.

19. [Mother] was observed as not having a bond with [K.T.] but having a bond and being more interested in her older daughter.

20. [Mother] was inconsistent in attending visitations and at times was late.

21. Visitations were suspended in January of 2013.

10

22. [Mother] is unemployed and resides with her parents. This is not an appropriate home as the maternal grandmother has a history with DCS. The maternal grandmother's odd behavior on the witness stand leads this Court to find she would be an inappropriate supervisor or caregiver for a child.

23 [K.T.]'s plan for permanency was changed on April 3, 2013, at which time the Court noted that providers had not recommended anything other than supervised visitations.

24. Visitation was actually became [sic] more supervised due to [Mother]'s unstable behavior.

25. There is a reasonable probability that the conditions that resulted in [K.T.]'s removal and continued placement outside the home will not be remedied by her mother. [Mother] has progressed minimally toward remedying conditions of domestic violence, anger, substance abuse, mental health, and instability. Given [Mother's] lack of insight into her problems, conditions will not be remedied in the future.

26. Continuation of the parent-child relationship between [K.T.] and her mother poses a threat to the child's well-being. Without successfully addressing identified conditions and concerns, [Mother] would never be able to provide a safe and stable environment or meet her needs. Additional time would not result in reunification. [Mother] has a pattern over the many months of saying she would participate yet does not follow through.

. . . .

34. [K.T.] is in a preadoptive foster home. She [is] doing well in this placement and the interaction between [K.T.] and the foster family has been observed as being loving and tender.

35. Termination of the parent-child relationship is in the best interests of [K.T.] Termination would allow for [K.T.] to be adopted into a safe, stable, loving and permanent home where her needs will be safely met after being in foster care for most of her life.

36. There exists a satisfactory plan for the future care and treatment of [K.T.], that being adoption.

37. The Guardian ad Litem agrees that it is in the best interests of [K.T.] that she be adopted, given the amount of time extended for parents to make progress and with the lack of commitment resulting in the same inappropriate

and unsafe environment.

*Appellant's App.* at 16-18. Mother now appeals. Additional facts will be added as necessary.

## DISCUSSION AND DECISION

## 1. Sufficiency of the Evidence

Mother first appeals the juvenile court's order terminating her parental rights to her daughter, K.T., contending that there is insufficient evidence to support the juvenile court's decision. Our Supreme Court recently set forth the following standard of review in termination cases:

> We have repeatedly recognized that parental rights are precious and protected by our Federal and State constitutions. Accordingly, when seeking to terminate parental rights, DCS must prove its case by clear and convincing evidence—a heightened burden of proof reflecting termination's serious social consequences.
>
> But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment.
>
> Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. Rather, it is akin to the reasonable doubt standard's function in criminal sufficiency of the evidence appeals— in which we do not reweigh the evidence or assess the credibility of the witnesses, and consider only whether there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. That is, we do not independently determine whether that heightened standard is met, as we would under the constitutional harmless error standard, which requires the reviewing court itself to be sufficiently confident to

12

declare the error harmless beyond a reasonable doubt. Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand, and not set aside [its] findings or judgment unless clearly erroneous.

*In re E.M.*, 4 N.E.3d 636, 641-42 (Ind. 2014) (citations omitted) (internal quotation marks omitted).

The Fourteenth Amendment to the United States Constitution protects the traditional liberty interest of parents to establish a home and raise their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *M.B.*, 666 N.E.2d at 76. In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish parents, but to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004).

To involuntarily terminate Mother's parental rights, DCS had to establish by clear and convincing evidence:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
. . . .

(B) that one (1) of the following is true:

13

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
. . . .

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Where, like here, a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, then we must affirm. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999).

In making its determination, the trial court does not need to wait to terminate parental rights until a child is irreversibly influenced by a deficient lifestyle so that her physical, mental, and social growth is permanently impaired. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Here, as required under Indiana Code section 31-35-2-4(b)(2)(A), (C), and (D), the juvenile court found that K.T. had been removed from Mother's care for at least six months, that termination of Mother's parental rights was in K.T.'s best interest, and that there was a satisfactory plan for K.T.'s care and treatment. Additionally, under Indiana Code section 31-35-2-4(b)(2)(B), the juvenile court found: (i)

14

there is a reasonable probability that conditions will not be remedied; and (ii) there is a reasonable probability that the continuation of the parent-child relationship poses a threat. *Appellant's App.* at 17. On appeal, Mother's argument focuses solely on whether there is "clear and convincing evidence" of a reasonable probability that Mother (i) will fail to remedy the domestic violence that led to K.T.'s removal; or (ii) the continuation of the parent-child relationship poses a threat to the well-being of K.T. Ind. Code § 31-35-2-4(b)(2)(B).

Mother recognizes that the statute requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we consider only whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of K.T. outside the home will not be remedied. *See* I.C. § 31–35–2–4(b)(2)(B)(i). To make this determination, the trial court should judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001). The trial court must also evaluate a parent's habitual patterns of conduct to determine if there is a substantial probability of future neglect or deprivation of the child. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010).

Among the circumstances that the trial court may properly consider are a parent's criminal history, drug and alcohol abuse, historical failure to provide support, and lack of adequate housing and employment. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a trial court "can reasonably consider

15

the services offered by [DCS] to the parent and the parent's response to those services." *Id.* DCS need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change. *In re Kay. L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Mother contends that because the CHINS case arose out of an incident of domestic violence with L.T., a man with whom she is no longer involved, the incident will not happen again. K.T.'s CHINS petition was filed on December 15, 2011. While the petition was prompted by a domestic violence incident between Mother and L.T., K.T. was not removed from Mother's care on that date. During a pre-trial CHINS hearing on January 23, 2012, Mother admitted the allegations in the CHINS petition, and the juvenile court ordered Mother to participate in services relating to mental health issues, domestic violence issues, anger issues, and substance abuse issues. In response, Mother "became loud and belligerent. She pushed back the chair and began to swipe things off. Began cursing at the judge. Called the judge several names and the bailiff came in . . . ." *Tr.* at 191. It was following Mother's erratic behavior that the juvenile court removed K.T. from Mother's care.

In an effort to accomplish reunification between K.T. and Mother, the juvenile court ordered Mother to participate in various services. In November 2012, about eleven months after the CHINS petition was filed, DCS asked that the permanency plan be changed from reunification to termination of parental rights and adoption. *Pet'r's Ex.* 13 at 43. The juvenile court noted in its order that Mother's home-based program was closed out unsuccessfully; Mother had not completed the recommended substance abuse treatment;

16

during visits with K.T., Mother often needed redirection in light of her inappropriate behavior and two supervisors were needed to oversee visitation; Mother was recently incarcerated for a battery charge; and Mother had not been able to make progress due to her anger issues and defiant behavior. *Id*. at 43. The juvenile court also noted Mother's failure to follow through with DCS service referrals and recommended treatments. *Id*. Notwithstanding Mother's shortcomings, the juvenile court still ordered "that the plan remain reunification." *Id*. at 44.

The next month, in December 2012, Mother pleaded guilty to disorderly conduct for yelling and screaming at a mental health center during her visit with K.T. *Pet'r's Ex.* 19 at 68. In February 2013, a mental health service provider threatened to discharge Mother due to her missed sessions; the provider, however, agreed to give Mother another chance, yet warned that if she missed three more times, Mother's case would be closed. *Pet'r's Ex.* 15 at 54. In March 2013, Mother was arrested for driving without having received a license. *Pet'r's Ex.* 19 at 69. At a second CHINS permanency hearing held on April 1, 2013, the juvenile court ordered K.T.'s permanency plan changed from reunification to adoption. *Pet'r's Ex.* 16 at 59. On April 17, 2013, DCS filed a petition for involuntary termination of Mother's parent-child relationship with K.T. *Appellant's App.* at 19. In May 2013, about eighteen months after the CHINS petition was filed, Mother was arrested for criminal recklessness and intimidation. *Pet'r's Ex.* 19 at 69. Mother was incarcerated or on home detention from June 14 through October, 28, 2013. In fact, Mother was released from detention only two days before the termination hearing.

Mother was given multiple chances to participate in services. When DCS asked that

K.T.'s plan be changed from unification to termination and adoption, the juvenile court gave Mother additional time to show that she could stay out of trouble and participate in the programs required to return K.T. to her care. Mother did not take advantage of these opportunities. At the time of the termination hearing, Mother still had 182 days of community corrections to complete and she was on house arrest at her mother's home. *Tr.* at 25. After hearing the evidence from DCS, the CASA, and the GAL, the juvenile court found:

> 25.     There is a reasonable probability that the conditions that resulted in [K.T.]'s removal and continued placement outside the home will not be remedied by her mother. [Mother] has progressed minimally toward remedying conditions of domestic violence, anger, substance abuse, mental health, and instability. Given [Mother's] lack of insight into her problems, conditions will not be remedied in the future.

*Appellant's App.* at 17.

Mother does not dispute: K.T. has been removed from Mother's care for at least six months under a dispositional decree; termination of Mother's parental rights is in K.T.'s best interest, and there is a satisfactory plan for K.T.'s care and treatment. Ind. Code § 31-35-2-4(b)(2)(A), (C), (D). K.T. was removed from Mother's care when K.T.'s safety required Mother to participate in services relating to issues of mental health, domestic violence, anger, and substance abuse, and Mother refused to participate. Here, the juvenile court concluded that the conditions that resulted in the removal of K.T. from Mother's home had not been remedied. We find that two years of Mother's unsuccessful efforts to address, and minimal progress toward remedying, the above issues constitutes clear and convincing evidence to support that conclusion. Here, the facts supported the findings, and

18

the findings supported the conclusion, by clear and convincing evidence, to terminate Mother's parental rights.

## II.    Motion for Continuance

Mother next contends that the juvenile court abused its discretion when it denied her October 17, 2013, motion for continuance of the fact finding hearing, which was set for October 30, 2013. Indiana Trial Rule 53.5 in pertinent part provides: "Upon motion, a trial may be postponed or continued in the discretion of the court, and shall be allowed upon a showing of good cause established by affidavit or other evidence."

DCS filed a petition for involuntary termination of Mother's rights to K.T. on April 17, 2013. *Appellant's App.* at 19. On May 10, 2013, Mother told the juvenile court that she would be obtaining private counsel. *Id*. at 32. That plan changed one week later, and the juvenile court appointed a public defender to represent Mother. *Id*. at 34. On May 31, 2013, Mother stated that she would have no objection to participating in mediation. *Id*. at 37. Mother's incarceration delayed mediation until August 27, 2013, at which time Mother and her counsel met with DCS, the GAL, the pre-adoptive foster mother, and her counsel. *Id*. at 41. One day after the meeting, the mediator reported to the court that no agreement had been reached. *Id*.

On August 30, 2013, at a pre-trial hearing where Mother's counsel was present, the juvenile court set October 30, 2013, as the full-day hearing date. *Id*. at 43. Thereafter, the hearing date never changed. On October 9, 2013, DCS sent Mother notice of the hearing date. Two weeks before the hearing, Mother's counsel requested a continuance. The petition stated that Mother had been in the Marion County Jail since August 2013 in

19

connection with a probation violation, and while she had expected to be released on October 11, 2013, her release date had been delayed until at least October 25, 2013—five days before the termination hearing. Accordingly, the petition requested a two-week continuance, stating that Mother's attorney "needs additional time . . . to prepare for trial in this case." *Appellant's App.* at 49. The juvenile court denied Mother's motion without making any findings. *Appellant's App*. at 49.

A trial court's ruling on a motion for continuance in a termination of parental rights case is reviewed for an abuse of discretion. *See J.M. v. Marion Cnty. Office of Family & Children,* 802 N.E.2d 40, 43 (Ind. Ct. App. 2004), *trans. denied.* "Discretion is a privilege afforded a trial court to act in accord with what is fair and equitable in each circumstance." *Id.* A trial court's ruling on a continuance motion should be set aside only if it is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* at 44. Even if the facts and reasonable inferences in certain instances might have allowed for a different conclusion, we will not substitute our judgment for that of the trial court. *Id.*

On appeal, Mother contends that she was entitled to a continuance to enable her to make progress in services. She argues that the juvenile court abused its discretion when it denied her motion for continuance because Mother's failure to make progress in services was a factor considered by the court to terminate Mother's parental rights.

The general rule in Indiana is that matters or arguments not raised in the trial court may not be raised in an appellate court. *M.S. v. C.S.,* 938 N.E.2d 278, 285 (Ind. Ct. App. 2010) (noting that party waives appellate review of issue or argument unless party raised

that issue or argument before trial court and concluding that appellant waived any claim that she was entitled to parenting time because she failed to raise the argument before trial court). Mother's motion for a continuance to the juvenile court cited counsel's need to prepare for trial. Mother raises for the first time on appeal her argument that a continuance was required to allow her make progress in services. Accordingly, we conclude this argument is waived.

Waiver notwithstanding, Mother's argument that she should have been granted a continuance to participate in additional services would have failed. Mother was responsible for the times she was unable to participate in services due to her incarceration. Mother knew of the CHINS determination almost two years prior to the termination hearing. She also knew which services she would have to complete to be reunited with her daughter. Nevertheless, Mother's actions led to her incarceration and home detention. Second, Mother requested only a two-week continuance. *Appellant's App*. at 49. Even two weeks of faithful participation in services would not have erased the two years during which Mother failed to participate and complete services.

Mother's cites to *Rowlett v. Vanderburgh County Office of Family & Children*, 841 N.E.2d 615 (Ind. Ct. App. 2006), *trans. denied*, to support her argument. In *Rowlett*, Father was incarcerated before he was ordered to perform any services. His motion to continue, which was filed three months prior to the hearing, was denied. *Id*. at 618. Father remained incarcerated until after his parental rights were terminated. *Id*. On appeal, we found that Rowlett had made positive strides in turning his life around while in prison, including not using drugs, participating in a Therapeutic Community, participating in nearly 1,100 hours

21

of individual and group services, and earning twelve hours of college credit. *Id*. at 619-20. Based on Father's improvement and the fact that continuing the hearing until sometime after Rowlett was released would have little immediate effect on the children as the plan was adoption by the maternal grandmother, we concluded that the trial court should have granted Rowlett's continuance. *Id*. at 620.

We find *Rowlett* clearly distinguishable from Mother's case. First, unlike Rowlett, who was incarcerated prior to being ordered to perform any services, Mother had many opportunities to participate in services. Second, while Rowlett was incarcerated during the entire pendency of the proceeding, Mother was in and out of jail during the CHINS and termination procedures and services were available to her.

Mother also would not have prevailed by arguing on appeal that the trial court abused its discretion in denying Mother a continuance to prepare for trial. DCS filed the petition for involuntary termination in April 2013, Mother obtained appointed counsel in May 2013, and, on August 30, 2013, the juvenile court set the hearing for October 30, 2013. Mother and her counsel knew by May 2013 that a hearing would be held to terminate Mother's parental rights. Further, Mother and her counsel learned of the hearing date two months prior. Regardless of whether Mother was in and out of jail during this period, the juvenile court did not abuse its discretion in finding that two months was more than sufficient time to prepare for the hearing.

The trial court did not abuse its discretion when it denied Mother's motion to continue the evidentiary hearing. Affirmed.

BAILEY, J., and MAY, J., concur.

22